Justice Kagan,
with whom Justice Alito joins, concurring.
I concur fully in the Court’s opinion. Neither the text nor the history of 17 U. S. C. § 109(a) supports removing first-sale protection from every copy of a protected work manufactured abroad. See ante, at 530-538, 548-551. I recognize, however, that the combination of today’s decision and Quality King Distributors, Inc. v. L’anza Research Int’l, Inc., 523 U. S. 135 (1998), constricts the scope of § 602(a)(1)’s ban on unauthorized importation. I write to suggest that any problems associated with that limitation come not from our reading of § 109(a) here, but from Quality King’s, holding that § 109(a) limits § 602(a)(1).
As the Court explains, the first-sale doctrine has played an integral part in American copyright law for over a century. See ante, at 538-540; Bobbs-Merrill Co. v. Straus, 210 U. S. 339 (1908). No codification of the doctrine prior to 1976 even arguably limited its application to copies made in the United States. See ante, at 533-534. And nothing in the text or history of § 109(a)—the Copyright Act of 1976’s first-sale provision—suggests that Congress meant to enact the new, geographical restriction John Wiley proposes, which at once would deprive American consumers of important rights and encourage copyright holders to manufacture abroad. See ante, at 530-538, 548-551.
That said, John Wiley is right that the Court’s decision, when combined with Quality King, substantially narrows *555 § 602(a)(1)’s ban on unauthorized importation. Quality King held that the importation ban does not reach any copies receiving first-sale protection under § 109(a). See 523 U. S., at 151-152. So notwithstanding § 602(a)(1), an “owner of a particular copy . .. lawfully made under this title” can import that copy without the copyright owner’s permission. § 109(a). In now holding that copies “lawfully made under this title” include copies manufactured abroad, we unavoidably diminish § 602(a)(l)’s scope—indeed, limit it to a fairly esoteric set of applications. See ante, at 546-547.
But if Congress views the shrinking of § 602(a)(1) as a problem, it should recognize Quality King—not our decision today—as the culprit. Here, after all, we merely construe § 109(a); Quality King is the decision holding that § 109(a) limits § 602(a)(1). Had we come out the opposite way in that case, § 602(a)(1) would allow a copyright owner to restrict the importation of copies irrespective of the first-sale doctrine.[1] That result would enable the copyright owner to divide international markets in the way John Wiley claims Congress intended when enacting § 602(a)(1). But it would do so without imposing downstream liability on those who purchase and resell in the United States copies that happen to have been manufactured abroad. In other words, that outcome would target unauthorized importers alone, and not the “libraries, used-book dealers, technology companies, consumer- *556 goods retailers, and museums” with whom the Court today is rightly concerned. Ante, at 540. Assdming Congress adopted § 602(a)(1) to permit market segmentation, I suspect that is how Congress thought the provision would work— not by removing first-sale protection from every copy manufactured abroad (as John Wiley urges us to do here), but by enabling the copyright holder to control imports even when the first-sale doctrine applies (as Quality King now prevents).[2]
At bottom, John Wiley (together with the dissent) asks us to misconstrue § 109(a) in order to restore § 602(a)(1) to its purportedly rightful function of enabling copyright holders to segment international markets. I think John Wiley may have a point about what § 602(a)(1) was designed to do; that gives me pause about Quality King’s holding that the first-sale doctrine limits the importation ban’s scope. But the Court today correctly declines the invitation to save § 602(a)(1) from Quality King by destroying the first-sale protection that § 109(a) gives to every owner of a copy manufactured abroad. That would swap one (possible) mistake for a much worse one, and make our reading of the statute only less reflective of congressional intent. If Congress thinks copyright owners need greater power to restrict im *557 portation and thus divide markets, a ready solution is at hand—not the one John Wiley offers in this case, but the one the Court rejected in Quality King.

 Although Quality King concluded that the statute’s text foreclosed that outcome, see 523 U. S., at 151-152, the Solicitor General offered a cogent argument to the contrary. He reasoned that § 109(a) does not limit § 602(a)(1) because the former authorizes owners only to “sell” or “dispose” of copies—not to import them: The Act’s first-sale provision and its importation ban thus regulate separate, non-overlapping spheres of conduct. See Brief for United States as Amicus Curiae in Quality King, O. T. 1996, No. 96-1470, pp. 5, 8-10. That reading remains the Government’s preferred way of construing the statute. See Tr. of Oral Arg. 44 (“[W]e think that we still would adhere to our view that section 109(a) should not be read as a limitation on section 602(a)(1)”); see also ante, at 553; post, at 576, n. 15 (Ginsburg, J., dissenting).

 Indeed, allowing the copyright owner to restrict imports irrespective of the first-sale doctrine—i. e., reversing Quality King—would yield a far more sensible scheme of market segmentation than would adopting John Wiley’s argument here. That is because only the former approach turns on the intended market for copies; the latter rests instead on their place of manufacture. To see the difference, imagine that John Wiley prints all its textbooks in New York, but wants to distribute certain versions only in Thailand. Without Quality King, John Wiley could do so—i. e., produce books in New York, ship them to Thailand, and prevent anyone from importing them back into the United States. But with Quality King, that course is not open to John Wiley even under its reading of § 109(a): To prevent someone like Kirtsaeng from re-importing the books— and so to segment the Thai market—John Wiley would have to move its printing facilities abroad. I can see no reason why Congress would have conditioned a copyright owner’s power to divide markets on outsourcing its manufacturing to a foreign country.